## William S. Keefer *v.* Isaac H. Keefer, Appellant.

*Replevin—Equitable estoppel—Ownership—Question for jury.*

One of the essentials of an equitable estoppel is, that the conduct or representations of the person to be estopped induced action by the other party, and where, in an action of replevin, the declarations made by the plaintiff bore not only upon the question of estoppel, but also upon that of ownership, both questions should have been submitted to the jury.

Argued March 25, 1898. Appeal, No. 44, March T., 1898, by defendant, from judgment of C. P. Franklin Co., April T., 1897, No. 133, on verdict for plaintiff. Before RICE, P. J., WICKHAM, BEAVER, REEDER, ORLADY, SMITH and PORTER, JJ. Reversed.

Replevin for a gray horse of the value of $100. Before STEWART, P. J.

The facts sufficiently appear in the opinion of the court.

Verdict and judgment for plaintiff. Defendant appealed.

*Errors assigned* were (1) in using this language in the charge to the jury: "If this case were between William S. Keefer and Jacob R. Keefer, involving the question of ownership of this particular horse upon the evidence submitted, I would have to instruct you that your duty would be to find for William S. Keefer." (2) In using this language in the charge to the jury: "Upon the evidence in this case, Jacob R. Keefer had not one cent's worth of ownership in that gray horse resulting from that trade. The horse belonged exclusively to William S. Keefer, the plaintiff in this case." (3) In using this language in the charge to the jury: "He has given no explanation of why he refused his father possession of the horse. It is for this reason that I say that if this case was between William S. Keefer and Jacob R. Keefer I would have to instruct you that the ownership of the horse was in William S. Keefer." (4) In using this language in the charge to the jury: "Has Isaac H. Keefer any higher right to the horse than Jacob? Jacob had none whatever." (5) In using this language in the charge to the jury: "Now then, William S. Keefer having established, as I have said, under the evidence in this case, his ownership of the bay horse originally and of this gray horse in suit, the law will allow his claim, unless the defendant has shown such conduct on his part as would constitute an estoppel. And the burden with respect to this rests on the defendant. He must satisfy you of that. The question is, Has he done it? Here comes the pinch in the case. It is the only question of fact for you to determine." (6) In using this language in the charge to the jury: "The horse was William S. Keefer's, there is no doubt about that. Jacob Keefer had no right to it." (7) In refusing to

affirm the defendant's point which was as follows : " If the jury believe from the evidence that while the horse was in possession of the defendant and before he purchased him, he was encouraged by the plaintiff to purchase the horse from Jacob R. Keefer and that he afterwards did purchase him in good faith and for a valuable consideration from the said Jacob R. Keefer, and this purchase was afterwards acquiesced in by the plaintiff by offering to purchase him from the defendant, the plaintiff cannot be heard to assert title in himself and the verdict must be for the defendant." (8) In admitting under objection an offer of evidence on the part of plaintiff of a list of judgments entered against Jacob R. Keefer down to March 1, 1897.

*W. Rush Gillan*, with him *W. R. Keefer*, for appellant.— The general principle now is that where the conduct of a party has been such as to induce action by another, he shall be precluded from afterwards asserting, to the prejudice of that other, the contrary of that of which his conduct has induced the belief : Hill v. Epley, 31 Pa. 331.

In the case at bar none of the elements of estoppel mentioned by Herman on Estoppel, pages 883, 884, is lacking in the point presented by the defendant.

The whole burden not only of showing that we acted upon his representations, but that we lost by them is, by the charge of the court, cast upon the defendant.

As to the list of liens offered in evidence no purpose accompanied the offer. If it was to show the insolvency of Jacob K. Keefer at the time of the horse deal, and that, therefore, the book account was worthless, it ought not to have been admitted, because it does not show his indebtedness at that time, but on the 1st of March. If it was to show his financial condition at the time the writ of replevin issued it had no place in the plaintiff's testimony, because it would only tend to confuse the minds of the jurors and hinder their proper consideration of the real question at issue.

*Garnet Gehr* of *Gehr & Gehr*, for appellee.—The case is clearly one of fact. From the evidence, the jury determined the facts in favor of the plaintiff. An examination does not justify the criticisms on the charge of the learned trial judge in appellant's argument.

OPINION BY RICE, P. J., December 15, 1898:

This was an action of replevin for a gray horse. The case went to trial on the plea of property. It appeared on the trial that William S. Keefer, the plaintiff, bought a bay horse of one Alice Myers, and gave a promissory note for the price with Jacob R. Keefer, his son, as surety. When the note matured, payment was demanded of Jacob and at his request the bay horse was delivered to him by his father to be disposed of for the purpose of raising money to pay the Myers note. Jacob traded with George Zullinger for a gray horse, the bay horse being valued at $70.00 and the gray horse at $100. The defendant, Isaac H. Keefer, subsequently bought the gray horse from Jacob, and the first question to be considered is whether Jacob had title. The court held as a matter of law that he had not. We are of opinion that the question should have been submitted to the jury.

Jacob's version of the transaction between him and Zullinger is, that Zullinger was to advance $50.00 to enable him to pay the Myers note—and a note was to be given to Zullinger for $80.00, being the boot money ($30.00) and the amount ($50.00) which Zullinger was to advance. To put the transaction in his own language : " I promised to give him note for $80.00 for his gray horse, and his check for $50.00 to pay the Myers note. I wanted to raise the money out of the bay horse to pay that note." He testified that the exchange of horses was then made; that subsequently his father came in, and he, Jacob, then prepared a note for $80.00, which he signed, and asked his father to sign, and sent the latter with the note to Zullinger; that his father returned with the note, saying that one Greenawalt (who it seems had an interest in the gray horse), declined to join in lending the $50.00, and bringing with him two notes, one for $30.00 payable to Zullinger and Greenawalt, and one for $50.00 to Zullinger alone, both of which his father had signed; that he then signed the two notes and delivered them to Zullinger; that in return Zullinger gave him a check for $50.00 across which were written the words, "to pay William S. Keefer's note for bay horse;" and that subsequently, he paid the Myers note amounting to $52.00. If the case rested here it might be argued with much force, that, even admitting the truth of this version of the transaction, the legitimate inferences from the

testimony would be, that Jacob was acting as agent for his father; that there was no apparent intention to transfer to him more than the bare custody of the bay horse with the power to sell it for his father's benefit; and, therefore, he acquired no ownership in the gray horse for which it was exchanged. But the case does not rest here. If Jacob is to be believed, he retained possession of the gray horse, and subsequently, settled with his father for the bay horse and paid him the difference .($18.00) between the price ($70.00) at which the horse was valued in the exchange, and the amount ($52.00) which he had paid to discharge the Myers note. There is an ·unfortunate conflict of testimony between him and his father upon this point; but assuming the fact to be as testified to by Jacob it may be asked, pertinently, why should he settle with his father and pay him this difference, if, as is now claimed, he was acting simply as his agent in the transaction?

Again, the defendant and four other witnesses testified to conversations in which William spoke of the gray horse as Jacob's horse. We need not quote this testimony. It is sufficient to say, that, if believed by the jury, it would have warranted them in finding, that, on more than one occasion, the plaintiff admitted that the gray horse belonged to Jacob, and also that he encouraged the defendant to buy him from Jacob. The intention of the parties, when ascertained from their acts and declarations, would determine the nature of the transaction, and the facts to which we have alluded if established to the satisfaction of the jury would have a legitimate tendency to show that they understood and intended that Jacob should take title to the gray horse and account to his father for the amount at which the bay horse was valued in the exchange. The credibility of the witnesses and the inferences to be drawn from the facts established by their testimony were for the jury. The declarations made by the plaintiff bore not only upon the question of estoppel but also upon the question of ownership. Both questions should have been submitted to the jury.

We are not prepared to say that the court committed error in refusing to affirm the defendant's point without qualification. One of the essentials of an equitable estoppel is, that the conduct or representations of the person to be estopped induced action by the other party. Possibly this idea was in-

tended to be conveyed by the words "good faith," but this is not clear. As the learned trial judge says, possibly the defendant may have bought the horse in good faith, but may not have been induced to do so by anything that the plaintiff said or did. Therefore the point needed qualification. But as the case goes back for a new trial we remark, that there was ample evidence to warrant a jury in inferring that the plaintiff's declarations induced belief in the defendant that Jacob owned the horse and had a right to sell him, and that he acted on this belief, but this was a question of fact for their determination. Subject to this qualification the equitable principle invoked seems to us to be correctly stated in the point. Whether or not it was applicable to the case would depend upon the finding of the jury as to the facts.

In view of the other evidence in the case we find no error in the admission in evidence of the record indebtedness of Jacob on March 1, 1897.

The judgment is reversed and a venire facias de novo awarded.